*Tillinghast & Ely*, for complainant.
*George Lewis Gower*, for respondents.

---

THE KING PHILIP MILLS *vs.* SAMUEL SLATER & SONS.

January 28, 1873, the P. Mills, about going into operation, agreed with S. to sell to him the production of 400 looms up to July 1; the goods to be made of a certain width, weight, and quality, and to be delivered in lots of 1,000 pieces.   Payment was to be made thirty days after the delivery of each lot.   The mill was expected to be in full operation by April 1, but deliveries were to be made earlier if possible, and the maximum production was to be reached as soon as practicable and to be maintained.   About April 17 two lots of 1,000 pieces each were delivered.   These pieces were deficient in width and weight. It then appeared that the P. Mills, to fulfil the contract, must procure new machinery, *i. e.* new sets of reeds.   Upon learning this, S. rescinded the contract.   In *assumpsit* by the P. Mills against S. for goods subsequently and before July 1 manufactured, tendered, and refused:

*Held*, that the contract was for successive deliveries of goods as manufactured.

*Held*, further, that the P. Mills, having failed in the first deliveries, could not compel S. to take goods subsequently manufactured and offered.

*Held*, further, that S. was justified in rescinding the contract.

The law of contracts containing dependent and independent agreements examined and the older cases criticised.

In contracts for successive deliveries the vendor cannot fail in the earlier deliveries and still hold the purchaser for the later ones.

ASSUMPSIT.   Heard by the court, jury trial being waived.

*March* 2, 1878.   POTTER, J.   The declaration charges that the defendants, on the 28th January, 1873, in consideration of the promise of the plaintiffs to sell to the defendants a certain quantity of jaconets, viz. : each lot which they should produce from 400 looms before July 1 (describing the quality, &c.), each lot to be of 1,000 pieces, undertook and promised to pay therefor

cash $7\frac{1}{2}$ cents per yard, 30 days from the delivery of each lot, and the plaintiffs aver that they proceeded to employ said 400 looms, &c., and on the 19th day of May were ready and willing, and offered to deliver 1,000 pieces, &c., conforming to agreement, which defendants refused to accept ; and the plaintiffs make similar averments as to subsequent lots of 1,000 pieces each for May 21, 27, June 3, 5, 11, 14, 19, 21, 26, 30, and July 3, being the products of said 400 looms between the dates, and alleging damages ; and in another count defendants aver that on the —— day of —— A. D. 1873, the defendants gave notice to plaintiffs that they should thereafter refuse to accept said goods, &c., &c.

The contract in this case was, after some introductory verbal negotiations, concluded by letter. On January 28, 1873, Mr. Chace, a director of the plaintiff company, wrote to Samuel Slater & Sons that he was instructed by the treasurer to accept the offer of $7\frac{1}{2}$ cents, 30 days from the delivery of each lot of jaconets the plaintiffs should produce on 400 looms before July 1, of specified width, weight, &c. The mill was expected to be in full operation by April 1, but they would begin to deliver sooner if they could, and they expected to do so.

The same day Samuel Slater & Sons replied to Mr. Chace, recapitulated the above, and said, " it is also understood that the maximum production is to be reached as soon as possible, and steadily maintained, unavoidable interruptions only excepted, until the completion of the contract ; . . . . and to be delivered in Providence in lots of $1,000 pieces each ; " and they request a confirmation of the sale from the treasurer. January 31 the treasurer acknowledged the receipt of a copy of Chace's letter, and of the letter of Samuel Slater & Sons, and ratifying " the above described contract," stated, " we will commence to deliver the goods as soon as we possibly can, and will reach the maximum production as soon as possible."

The price agreed on was to be paid in thirty days after the delivery of each lot.

It appears in evidence that two lots of goods of about the specified quantity of 1,000 pieces were sent to defendants on or before April 17, which, it is not disputed, were deficient in width and other particulars ; that April 17 the defendants telegraphed to the plaintiffs that the goods were deficient in width

and weight, and to send no more until right ; that April 18 they wrote to plaintiffs to the same effect, that they needed an immediate supply, and inquiring " what are we to expect; " that April 19 the plaintiffs wrote that they would get new reeds, that they had measured the width with a tape, &c., &c.)

And April 21 the defendants wrote to the plaintiffs that as they must have an immediate supply or stop their mill, the contract was terminated.   The defendant's agent testified that as soon as they found that the plaintiffs had such reeds and no others they gave this notice to terminate the contract.

It is not disputed that the goods were to be delivered in lots of 1,000 pieces each; but it is contended by the plaintiffs' counsel that it would have been a compliance with the contract if all had been delivered in June.   This is not the construction which would strike the mind of an ordinary intelligent business man as being the proper one, and we do not think it is the correct view.   We think it is plain that the deliveries were to be made as the goods were manufactured.   By the letters, the plaintiffs were to begin to deliver as soon as possible, theirs being a new mill, and were to reach the maximum production of the 400 looms as soon as possible.   The defendants were engaged in finishing this sort of goods for the market, and bought these goods to supply their mills for that purpose ; and two witnesses say that it was not a common style of goods, and there were but few in market.   Both parties were manufacturers and in a manufacturing community, and might well be supposed to know something of each other's business and wants.

We think the reasonable construction of the letters is that the defendants were to have the whole production of 400 looms, deliveries to commence as soon as possible, and to be continued in lots of 1,000 each as fast as produced.

The question then arises, Were the defendants justified in rescinding the contract ?   We think they were.   The first two lots were, without dispute, not according to the contract.   The width was material.   The plaintiffs had made the mistake as to the width from measuring it with a tape.   They were also using a kind of reeds unsuitable for the manufacture, and there could be no reliance on the future product.

The plaintiffs having failed in the first deliveries, the defend-

ants were not bound to take the goods offered during the latter part of the period. To hold that where successive deliveries of goods of certain qualities and quantities are to be made at successive periods, the purchaser, while he may reject those not of the quality, is bound to take those which are of the agreed quality to the end of the time, would introduce an element of uncertainty into such matters highly injurious to the interests of a business community. The purchaser may, indeed, choose not to rescind, and to accept them; and so he may accept even those not of the quality; and if so he must pay for them what they are worth. And the case would be very different, if in a contract to be paid for in one sum at the last delivery, the seller, having complied with all the previous deliveries, failed in some of the latter ones. In such a case the purchaser would have received a benefit from the contract, and it would be right that he should pay for the benefit received.

It is to be observed here, that the plaintiffs do not allege in their declaration that they began to deliver the jaconets as soon as possible, nor that the maximum production was reached as soon as possible; nor do they definitely allege that the whole product of 400 looms was at any one time ever sent to the defendant. And there is no positive evidence that the whole number of 400 looms was ever put upon this contract. And passing over entirely the first two deliveries of imperfect goods, they proceed to allege a readiness to deliver under the contract on the 19th of May, and so on.

They do not allege a performance on their part of the agreement they prove.

The purchasers were not bound to take any goods not according to the contract, as the two first lots of jaconets were; and the only question is, When, after failure on the part of the vendors, have the purchasers a right to rescind and look elsewhere for their supplies? In this respect each case must depend on its own circumstances. To hold that the purchaser must receive such lots as are of the right quality, and that for the periods when they are not so he must supply himself elsewhere, and sue for his damages, or claim to deduct them, would introduce confusion into business. It would in most cases entirely frustrate the object of the contract.

As the arguments on both sides have been very able and ingenious, both on principle and authority, it may be well to consider some of the cases to which our attention has been invited.

The most important points in the decision of such cases are: *first*, Whether the covenants or agreements are independent, *i. e.* where one can sue the other without performance of his own part of the bargain; or dependent, *i. e.* where one party cannot sue unless he has performed, or has offered, or is willing to perform his own part of it; and *second*, whether the time is material, or, as sometimes expressed, whether time is of the essence of the contract.

The plaintiffs contend, as we understand them, from the statements of their counsel and from the cases they cite, that time was not essential in the present contract; and that the agreements on each side were so far independent that the plaintiffs can maintain their suit, and leave the defendants to their cross action for any damages they, the ·defendants, have suffered from the plaintiffs' failure to fully perform.

Several of the cases relied on by the plaintiffs go back to and cite *Pordage* v. *Cole*, 20 & 21 Charles II. A. D. 1669 ; 1 Saund. 319 *i*, case 54, as authority.   In that case plaintiff had agreed to sell land, and the defendant had agreed to pay the plaintiff £775 for his land at a time appointed.   The plaintiff did not allege that he had ever conveyed or offered to convey the land, but sued the defendant for the money.

To persons of ordinary intelligence it would seem that although the money was to be paid at a particular time, yet as it was stated and admitted that it was for the land, the purchaser should not be required to pay until he got the land; unless, which does not appear, the parties, when making the contract, knew it could not be conveyed by that time.   Then the defendant would have contracted with his eyes open.

But the learned court held that the plaintiff should have his judgment for the money, and the defendant should be left to sue for his damages for not conveying the land.

In some cases of this sort justice might be done under the law and practice of set-off, by letting both parties sue and retaining the cases until both could be decided.   But this would be a very roundabout way of doing justice.

The court seems in this case to. have been influenced by the fact that the agreement was under seal. But justice requires that the intentions of the parties should control as much in that case as in any other case of contract.

When in *Goodisson* v. *Nunn*, 4 Term Rep. 761, A. D. 1792, in an action on a contract similar to the foregoing, except that a time was .expressed for making the deed, *Pordage* v. *Cole*, with 1 Rol. Abr. 415, pl. 8, and *Blackwell* v. *Nash*, 1 Str. 535, were cited for the. plaintiff, Lord Kenyon, C. J., in giving his decision, said that the determinations in those cases outraged common sense. He considered the old cases overruled by the decision of Lord Mansfield in *Kingston* v. *Preston*, as given in *Jones* v. *Barkley*, Douglas, 689. And Buller, J., said if there had been no case in opposition to those old ones, he should not hesitate to make a precedent. And Grose, J., considered the later decisions as the most sensible.

So in *Glazebrook* v. *Woodrow*, 8 Term Rep. 366, 371, Grose, J., criticises the tendency of the old cases to construe the covenants to be independent as " contrary to the real sense of the parties and the true justice of the case." See .also the remarks of Lawrence, J.

And the tendency of modern decisions is to introduce more equitable rules, to endeavor to carry out the intention of the parties, and to construe the agreements as dependent when possible. See Lord Mansfield's rules in *Kingston* v. *Preston*, Douglas, 689 ; Evans's Decisions of Lord Mansfield, 1 ; *Ritchie* v. *Atkinson*, 10 East, 295, 310 ; and see *Bank of Columbia* v. *Hagner*, in the United States Supreme Court, 1 Pet. 455, 465.

The case of *Hoare* v. *Rennie*, came before the English Court of Exchequer, A. D. 1859, 5 H. & N. 19. The defendants agreed to buy of the plaintiffs 667 tons of iron, " to be shipped from Sweden, in June, July, August, and September, and about equal quantities each month, with an option to commence earlier." The defence was that the plaintiffs did not commence earlier, and shipped only twenty-one tons in June, and were not ready to deliver those until the month had expired. The defendants thereupon refused to go on with the contract, and gave notice accordingly. The judges speak very plainly ; p. 27, Pollock, C. B., " The only question is whether if a man who is bound to perform

his part of a contract, does not do so, he can enforce the contract against another party ; " and " whether if the sellers at the outset send a less quantity than they are bound to send, so as to begin with a breach, they can compel the purchasers to accept and pay." Condition precedent is not the test. If, after the shipment had been made and accepted, the seller had sent a short quantity, that might have made a difference. But the defendants in this case " were ·no more bound to accept the short quantity than if a single delivery had been contracted for ; " and p. 29, Channell, B., " The defendants have not accepted anything which can be construed as an imperfect execution. of the contract by the plaintiffs. The defendants were thus at liberty to rescind the contract."

This is a very instructive case, and the remarks of the judges are deserving of great consideration.

That case differs from the present in this, that in *Hoare* v. *Rennie*, the plaintiffs did aver that they had performed and done all things necessary on their part. But the same claim was made there that the contract was to deliver the coal in four months, and not month by month.

Where the agreements are entirely independent, or where the contract is severable, there may in some cases be a suit without performance or full performance by the plaintiff. And the parties may include in one instrument matters so distinct, or make their intention so plain that the court must adopt that construction. But where the thing to be done on one side is the consideration for the thing to be done on the other, the court will lean toward considering them as dependent or conditional, *i. e.* one cannot sue the other without showing performance, or an offer of performance on his part. And this especially in the case where money is to be paid for something done or delivered, when it could not be supposed that the intention of the parties was that the money was to be paid without performance on the other side.

But it is difficult to reconcile the cases, and especially some of the older ones, to our notions of justice.

And Williams, whose notes to Saunders's Reports are of almost equal authority with the work he edits, is obliged to say that " almost all the old cases, and many of the modern ones, on this subject, are decided upon distinctions so nice and technical, that

it is very difficult, if not impracticable, to deduce from them any certain rule " as to what agreements are independent or dependent. " The judges in these cases seem to have founded their construction . . . . on artificial and subtle distinctions, without regarding the intention and meaning of the parties or the good sense of the case; and technical words should give way to such intention." 1 Williams' Saunders, 320 *a*, n. (4).

This is a very lawyer-like and respectful way of saying what Lord Kenyon said in much plainer language.

In *Jonassohn et al.* v. *Young*, 4 B. & S. 296, which was a contract by the plaintiffs to sell and deliver, and by the defendant to purchase, so much coal as one vessel could bring in nine months, the defendant to send the vessel, the plaintiffs alleged that the defendant did not send the vessel. The defendant pleaded that before any breach of the contract by him the plaintiffs broke it by sending inferior coal, wholly unfit, as the plaintiff well knew, for their use, &c., &c. Judgment for plaintiffs, but no opinion delivered. It is evident, however, that the court did not consider time as essential.

In *Simpson* v. *Crippin*, A. D. 1872, L. R. 8 Q. B. 14, the defendant agreed to supply the plaintiff with 6,000 to 8,000 tons of coal, to be delivered in plaintiff's wagons at the defendant's colliery, in equal monthly quantities during twelve months. The first month the plaintiff took only 158 tons, and the defendant notified him that he rescinded the contract. The plaintiff refused to consider it annulled, and sued for damages. The judge on the trial told the jury that as the plaintiff did not intend to break the contract month by month, but only broke it the first month, the defendant could not rescind it. Verdict for plaintiff. On motion for a new trial, the Queen's Bench, by a majority, sustained the verdict; one judge observing that there did not appear to be any sufficient reason why damages would not compensate the defendant for the breach by the plaintiff, and another judge observing that there were no words in the case to show that time was of the essence of the contract.

It was argued by the counsel in this case that the contracts for the different months were entirely independent of each other, and the court must have so considered them: rather a strained construction.

It is very evident that the decision in the cases of *Simpson* v. *Crippin* did not meet with the approval of the profession in England. The argument against it is strong. The question, it is said, is whether, in a contract for a series of acts, the party originally entitled to call for the performance of the last act will be still entitled to recover, although he has not performed his part of the preceding acts. It would be unjust that he should do so ; it would damage trade by making it impossible to calculate upon the future ; and the very purpose of such contracts would be frustrated. 17 Solicitors' Journal, 219.

And it seems to us that when articles are to be furnished in certain quantities per week or per month, and there is no waiver of the condition, the decision in *Simpson* v. *Crippin* really makes a new contract for the parties, instead of carrying out the one actually made by them. The agreement was to deliver a particular quantity per month. It is difficult to understand how that part of the agreement could be held to be immaterial unless there was evidence of a subsequent waiver, or some other evidence that is not reported ; and a party should not be compelled to resort to a cross action in such cases.

In the case of *Bowes* v. *Shand*, before the English House of Lords, L. R. 2 App. Cas. 455, which was a case of a contract for the purchase of rice, to be delivered at one time only, it was claimed that the purchaser was obliged to take the rice and to resort to a cross action for any damages. This claim was pointedly repudiated by two of the judges, and not deemed worthy of notice by the others. See pages 461, 467, 480.

In cases of a contract of sale, so far completed or executed as to pass the title to the property, where the purchaser having paid the money cannot resort to a claim for deduction or recoupment, a cross action might, indeed, in many cases, be the only remedy.

The case of *Boone* v. *Eyre*, cited by the plaintiff, 1 H. Blackstone, 273, note, was this : The plaintiff had sold an estate with some negroes, with the usual covenants for title, for a sum in gross and an annuity. It would seem, from the criticisms on the case, that the facts were that the estate, &c., had been conveyed, but that the title to some of the slaves failed. On suit by the plaintiff for the annuity, the defendant pleaded that plaintiff had no title to the slaves ; but the court sustained the demurrer to the plea, holding that the covenants were independent.

The true ground of the decision would seem to be, that the defendant had the advantage of the performance of the substantial part of the agreement, and should not be permitted by his plea to prove non-performance in some small particulars, and so defeat the plaintiff's entire claim, but for such matters should be left to his cross action. See remarks of Le Blanc, J., in *Glazebrook* v. *Woodrow*, 8 Term Rep. 366, 375, and of Lawrence, J., 373 ; and see remarks of Ashhurst, J., quoted in *Campbell* v. *Jones*, 6 Term Rep. 573. See also *Hoare* v. *Rennie*, 5 H. & N. 19, 25, 29, and *Ritchie* v. *Atkinson*, 10 East, 295, 306.

In *Ritchie* v. *Atkinson*, 10 East, 295, a vessel was to bring a complete cargo from St. Petersburg. After loading in part, she left, for fear of an embargo, before getting a full load. It was held that the master could recover. This, in the modern cases, would be explained by saying that the master having exercised his best judgment, and the freighter having received a benefit, he should pay for that benefit, deducting any damages. So in *Havelock* v. *Geddes et als.* 10 East, 555.

It seems strange that of the almost infinite variety and number of cases of contract coming before the courts, there should have been so few where the agreement was for successive deliveries at more or less definite periods ; and that when they have occurred, the decisions should have been so conflicting. This conflict has arisen, partly, we think, from applying to this class of contracts, distinguished from all others by this marked peculiarity, principles of decision which properly belonged only to other classes of contracts.

In cases of contracts for successive deliveries the doctrine of condition precedent becomes more difficult of application. So also when in such cases the articles already delivered have been used, it becomes impossible for the party rescinding to return them and put the other party in *statu quo.*

In the progress of improvement in mechanics and the arts old systems of labor and of trade are changing, each branch of business becomes more and more subdivided, and, in consequence, every subdivision becomes more and more dependent upon others, and upon the strict and honest performance of the portion of the work they contribute towards the final product. And thus it is becoming more and more important, as this interdependence of

different branches of trade increases, that contracts of this sort should be carried out according to their spirit and object, without regard to the mere technicalities and, we might well say, quibbles, of the older decisions.

We think the decision we have made the one which carries out the spirit and object of this particular contract, as it would be generally, and we think rightfully, construed by the business community.

The charge not directly made, but incidentally thrown out, that the defendants were induced to rescind, from the expectation that they would be able to get the same goods at a lower rate from other sources, is not supported by a tittle of evidence. It is entirely denied by the defendants. The market had indeed been a falling market ever since the war, and this fact, the defendants claim, rendered it all the more important that they should receive their supplies punctually and without delay.

> *Judgment for the defendants for their costs.*

*Benjamin F. Thurston & John D. Thurston*, for plaintiff.

*A. & A. D. Payne*, and *John F. Tobey*, for defendants.

NOTE. — The foregoing case was heard by BURGES, POTTER, and MATTESON, JJ.